Filed 2/13/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WESTERN STATES PETROLEUM ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CALIFORNIA AIR RESOURCES BOARD,<br><br>    Defendant and Respondent. | B327663<br><br>(Los Angeles County Super. Ct. No. 20STCP03138) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Pillsbury Winthrop Shaw Pittman, Michael S. McDonough, Margaret Rosegay, Stacey C. Wright, and Eric T. Moorman for Petitioner and Appellant.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Gary E. Tavetian, Kristin K. McCarthy, and Jessica Barclay-Strobel, Deputy Attorneys General, for Defendant and Respondent.

————————————————

The California Air Resources Board (CARB) is responsible for establishing air quality standards to protect public health across the state's air basins. (Health & Saf. Code, §§ 39600, 39601, subd. (a), 39606, subd. (a).) To do so, CARB is required to "adopt airborne toxic control measures to reduce emissions of toxic air contaminants from nonvehicular sources." (*Id.*, §§ 39659, 39666, subd. (a).) In August 2020 CARB adopted the Control Measure for Ocean-Going Vessels At Berth (the Regulation or Proposed Regulation; Cal. Code Regs., tit. 17, § 93130 et seq.), which limits emissions from tankers and other ocean-going vessels while at berth, meaning while docked or anchored at California ports or terminals.[1] Western States Petroleum Association (WSPA)[2] challenged the Regulation by way of a petition for writ of mandate. WSPA contended CARB acted arbitrarily and capriciously by adopting the Regulation because the Regulation requires emissions control measures that could not feasibly be designed and implemented on vessels, barges, terminals, and ports by the 2025 and 2027 deadlines applicable to tankers. WSPA further asserted CARB violated the Administrative Procedures Act (APA; Gov. Code, § 11340 et seq.) by failing to timely disclose a report CARB had commissioned

---

[1] A terminal is the area where the sea meets the land, including "wharves, piers, docks, [and] other berthing locations and storage, which are used primarily for loading and unloading of passengers, cargo or material from vessels or for the temporary storage of this cargo or material on-site." (Cal. Code Regs., tit. 17, § 93130.2, subd. (b)(75).)

[2] WSPA is a nonprofit trade association that advocates for the oil and gas industry in California and four other western states.

measuring tanker emissions.  Finally, WSPA argued CARB violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) by insufficiently analyzing both the safety hazards associated with the proposed methods of compliance with the Regulation and the cumulative impacts on the environment that could follow as an indirect result of adopting the Regulation.

The superior court properly denied WSPA's petition for writ of mandate.  We give considerable deference to CARB's exercise of its quasi-legislative role in promulgating regulations under its statutory authority to design and implement air pollution measures.  CARB had the authority to set emissions standards that would require technology that does not yet exist but is achievable by the compliance deadline, and WSPA has not met its burden to show that evidence was entirely lacking for CARB's determination the necessary emissions control technology would be developed in time.  CARB also substantially complied with the notice provisions of the APA that required CARB to timely make all information relating to the Regulation available to the public. Finally, WSPA has not shown CARB violated CEQA by failing to adequately analyze the reasonably foreseeable hazards or the cumulative impacts on the environment from the implementation of the Regulation.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Regulation of Marine Vessel Emissions*

The Regulation limits emissions from equipment on ocean-going vessels, including tankers, while at berth in California. (Cal. Code Regs., tit. 17, §§ 93130.1, 93130.5, subd. (d)(1)-(2).)

3

Ocean-going vessels are large ships that transport cargo or passengers.  The Regulation applies to the following types of ships: container, refrigerated cargo (also called reefer), passenger (also called cruise), auto carrier and roll on-roll off (collectively, ro-ros, which carry wheeled cargo that can be rolled on and off the vessel, like cars), tanker (which primarily carry liquid bulk cargo, like petroleum crude or non-petroleum based products), bulk (which carry unpacked dry bulk cargo), and general cargo.  (*Id.*, § 93130.2, subd. (b)(11), (22), (55), (64), (69) & (74).)

The Regulation targets emissions from vessels' auxiliary engines and boilers.  (Cal. Code Regs., tit. 17, § 93130.5, subd. (d)(1)-(2).)  Auxiliary engines generate electricity to power non-propulsion functions like pumps and lights while a vessel is at berth.  (*Id.*, § 93118.3, subd. (c)(2).)  Boilers, particularly on large tankers, power steam-driven pumps to offload crude oil.  The Regulation seeks to reduce emissions from these sources while vessels are idle.  (*Id.*, §§ 93130.1, 93130.3, subd. (a).)  The Regulation is designed to reduce the following emissions from ocean-going vessels:  (1) nitrogen oxides, (2) particulate matter, (3) diesel particulate matter, (4) reactive organic gases, and (5) greenhouse gases.  (*Id.*, § 93130.1.)  The targeted emissions increase the risk of premature mortality, heart and lung disease, and other respiratory ailments, and can form acid rain in the atmosphere.  These emissions particularly affect the communities surrounding California ports, many of which are recognized as disadvantaged by the California Environmental Protection Agency.  (*Ibid.*)  In addition to reducing the public's exposure to these air pollutants, the Regulation is also intended to reduce emissions to combat global warming.  (*Ibid.*)

4

CARB has regulated emissions from ocean-going vessels since 2008 through the Airborne Toxic Control Measure for Auxiliary Diesel Engines Operated on Ocean-Going Vessels At-Berth in California (the Existing At-Berth Regulation; former Cal. Code Regs., tit. 17, § 93118.3, Register 2008, No. 49 (Jan. 2, 2009), as amended by Register 2021, No. 1 (Jan. 1, 2021)). The Existing At-Berth Regulation, which reached full implementation in 2014, limited emissions, including nitrogen oxides and particulate matter, from auxiliary engines on container, reefer, and cruise vessels by restricting engine operating time, and applied to six California ports. (*Id.*, subds. (a), (b)(3), (c)(6).) Regulated vessels were required to reduce emissions at berth by plugging into shore power or using an equally effective compliance strategy, such as a "capture and control" system. (*Id.*, subd. (d)(1)(D) & (I).) In 2017, CARB began developing amendments to the Existing At-Berth Regulation, which became the Regulation, to extend the emissions control requirements to additional categories of vessels, including tankers and ro-ros, and to expand the applicability of the Regulation to marine terminals and additional ports within California. Regulated vessels would be required to use emissions control strategies to reduce auxiliary engine and boiler emissions by at least 80 percent while at berth.

Tankers, which often carry liquid or gaseous products such as crude oil, pose unique safety concerns due to the hazardous or flammable nature of their cargo. CARB acknowledged these safety considerations in the Initial Statement of Reasons for the Regulation, noting that tankers must be able to break away from their berths within 30 minutes during an emergency, making emissions control technology connections more complex. CARB also acknowledged structural differences between tanker

5

terminals and other terminals because of the safety issues. Tankers use auxiliary diesel engines, which can use shore power, for lights and ballast pumps (i.e., water pumps) while at berth. Tankers also often use boilers, which cannot be electrified using shore power, to burn fuel to produce high-pressure steam for offloading crude and other cargo.

B.    *The Rulemaking Process*

CARB began formal consideration of the Regulation in 2017, including a CEQA review pursuant to CARB's status as a "certified agency" under California Code of Regulations, title 17, sections 60000-60007. It issued a Standardized Regulatory Impact Assessment in August 2019, followed by the Initial Statement of Reasons and a draft Environmental Impact Assessment (Draft EA) on October 15, 2019. The Draft EA was circulated for public comment through December 9, 2019. On December 5, 2019, CARB's Board held a public hearing to receive the staff's report on the Regulation. CARB then released two sets of proposed changes for comment on March 26, 2020 (First 15-Day Changes) and July 10, 2020 (Second 15-Day Changes), respectively. On June 25, 2020, CARB's Board held another hearing, at which CARB provided an update on the Regulation and First 15-Day Changes. CARB staff reviewed the comments on the Draft EA and issued written responses. On August 25, 2020, CARB released the Final Environmental Assessment (Regulation EA or EA). CARB then held a public hearing on August 27, 2020, and responded to additional comments. CARB's Board adopted the Regulation following the August 27, 2020 hearing. CARB released the Final Statement of Reasons on November 12, 2020.

During the rulemaking, WSPA submitted numerous comments objecting to the Regulation, the Draft EA, and the Regulation EA.

1. *Compliance options*

CARB conceived of two compliance methods for tankers: (1) shore power and (2) capture and control systems.

Shore power involves connecting a vessel to shore-based electrical power, which allows the auxiliary engines to be shut off. Most vessels use shore power to comply with the Existing At-Berth Regulation. In the Initial Statement of Reasons, CARB stated it "expect[ed] shore power to be the compliance option of choice at container, reefer, and cruise terminals under the Proposed Regulation . . . [because] most vessels fleets have already invested in the vessel side infrastructure to comply with the Existing [At-Berth] Regulation."

However, CARB acknowledged that ro-ro and tanker operators were reluctant to invest in shore power because their vessels made fewer trips to California ports. In addition, tankers often use boilers to power their pumps, and shore power generally cannot be used to power boilers. Thus, CARB assumed the majority of tankers would use capture and control systems, not shore power, to treat boiler emissions in order to comply with the Regulation.

Capture and control systems capture and clean emissions from auxiliary engines or boilers, allowing vessels to use that equipment while at berth. Capture and control technology can be deployed via barges, land-based units, or onboard systems. Two barge-based capture and control systems (Maritime Emissions Treatment System and Advanced Maritime Emissions Control System (AMECS)) designed by two technology providers (Clean

Air Engineering-Maritime (CAEM) and Advanced Environmental Group (AEG), respectively) have been used by container vessels at the Port of Long Beach and Port of Los Angeles. At least one land-based capture and control system (ShoreKat, provided by CAEM) has been used in the Port of Los Angeles. At the time CARB adopted the Regulation, there was no capture and control system tested and approved for tankers.

2. *Compliance deadlines*

Because CARB anticipated tankers would rely in part on land-based capture and control systems, it set compliance deadlines that reflected the "time needed to develop and install land-based capture and control systems and the associated infrastructure." The original deadlines were January 1, 2021 for container, reefer, and cruise vessels; January 1, 2025 for ro-ros; January 1, 2027 for tankers at the Ports of Los Angeles and Long Beach; and January 1, 2029 for tankers at all other terminals. In the First 15-Day Changes, CARB maintained the January 1, 2021 deadline for container, reefer, and cruise vessels, but accelerated the other implementation dates to January 1, 2024; January 1, 2025; and January 1, 2027, respectively. In the Second 15-Day Changes, CARB maintained the same deadlines for tankers (January 1, 2025 for the Ports of Los Angeles and Long Beach and January 1, 2027 for all other ports and terminals) but extended the deadlines from 2021 to 2023 for container, reefer, and cruise vessels, and from 2024 to 2025 for ro-ros "to give regulated entities additional time to prepare for compliance in light of the current economic downturn" as a result of the COVID pandemic.

8

3.    *Relevant studies*

In 2019, CARB commissioned engineers at the University of California, Riverside, Bourns College of Engineering Center for Environmental Research and Technology (CE-CERT) to conduct a study to evaluate emissions from a tanker auxiliary boiler while offloading fuel at berth (the Report).  CE-CERT completed its draft Report in March 2020, and CARB provided it to WSPA in early July 2020.  CE-CERT's tests of tanker operations in 2019 and 2020 showed lower average emissions rates for nitrogen oxides and particulate matter than shown by the data relied on by CARB in setting the Regulation's new emissions standards.

In comments, WSPA asserted CARB had failed to address and account for the results of the Report.  WSPA asserted the proposed emissions standards were based on an outdated 2002 study focused on a fleet of tankers from the 1980s that burned fuel oil, and most, if not all, of those tankers had been replaced by tankers that do not burn fuel oil.  Moreover, WSPA noted burning fuel oil has not been allowed for any tanker since 2008, and therefore the emission factors CARB used, specifically for nitrogen oxides and particulate matter, were not representative of the tankers operating today.

In the Final Statement of Reasons, CARB responded that it disagreed with WSPA's comments because the emissions factors CARB used to develop the Regulation "were the best available at the time" and were used by the United States Environmental Protection Agency (EPA), other states, international groups, and the Canadian government.  CARB noted that during the development of its emissions estimates, "CARB staff worked with the tanker industry to better reflect actual operation parameters of any advanced engine and boiler systems," and CARB

9

incorporated the new information into CARB's emission estimates. CARB noted it had initially released the draft emissions inventory in February 2019 to allow comment and "collaborative interaction with the industry and other stakeholders," and had held a public workshop to solicit stakeholders' feedback. CARB updated certain emission factors from the 2002 study, such as incorporating emission factors from a 2009 EPA report to adjust the previous emission factors for fuel sulfur content.

CARB also explained its decision not to rely on the results of the draft Report. CARB stated the "preliminary emissions data" the Report relied on was derived from "the newest generation of tankers that came into service in the last few years" and therefore was "not broadly applicable to the wider tanker fleets, consisting of many vessels with older boiler technologies." For example, a Chevron tanker, used in one of the studies, represented only 5 percent of California's total tanker at-berth activity in 2018. CARB expected those cleaner vessels would not enter inventory until approximately 2030. CARB concluded it "would thus be inaccurate and extremely misleading to base the inventory on the emissions data in the CE-CERT study." CARB also expressed concerns that the Report had not yet been peer reviewed or verified.

Separately, beginning in early 2019, WSPA raised concerns that the necessary emissions control technology did not exist and that CARB's timeline was unrealistic. WSPA focused on the particular safety concerns applicable to tankers and their boiler systems. WSPA requested CARB conduct a feasibility study to address the concerns.

CARB responded that it had "performed a feasibility

analysis of the anticipated control technologies for new vessel types, such as ro-ro vessels. Through the analysis, developed by numerous discussions with technology manufacturers and marine emissions control experts, CARB has assessed and determined that control technologies are available and viable for both current, and newly regulated vessel types." CARB stated it was "confident that the ample information collected and released in the Rulemaking [including in the Standardized Regulatory Impact Assessment and the Health Risk Assessment, which identified the risks of exposure to emissions on public health] is equivalent to a feasibility study as requested by the commenter." However, CARB indicated it had "evaluated several terminal construction projects to assess the feasibility of emission control systems," including:

- A shore power project at the Port of Long Beach for tankers;
- Shore power upgrades for several Port of Long Beach piers;
- Tanker infrastructure projects;
- The Chevron Richmond Long Wharf Marine Oil Terminal Engineering & Maintenance Standards and Wharf Maintenance and Efficiency projects;
- The Port of Richmond International-Matex Tank Terminals Wharf Modification project;
- The Port of Long Beach Berths (Shell) Marine Oil Terminal Wharf Improvements project; and
- The ShoreKat land-side capture and control demonstration project.

CARB found that its "evaluations and findings support staff's proposed implementation schedules."

11

CARB concluded the additional studies suggested by commenters were not necessary to determine the overall feasibility of the Regulation, opining most terminals should be able to implement capture and control systems without additional analysis. Although some "site-specific" feasibility studies were necessary to evaluate technical and safety concerns, the regulated entities were responsible for conducting those studies, as CARB staff did "not have access to the information needed for each site location to perform this type of analysis."

CARB asserted its conclusions regarding feasibility were based on a lengthy interactive process with the public and stakeholders. Additionally, the EA included a 12-page assessment of potentially significant safety impacts, such as hazardous materials risks and mitigation measures.

C.      *The Regulation*

On August 27, 2020, CARB adopted the Regulation. (Cal. Code Regs., tit. 17, § 93130.) CARB promulgated the Regulation under Health and Safety Code sections 39600 and 39601, which direct CARB to adopt standards and regulations as necessary to carry out the duties imposed on CARB under the California Clean Air Act (Health & Saf. Code, § 39000 et seq.) and other law. CARB also relied on the following specific Health and Safety Code provisions, which instruct and authorize CARB to carry out certain duties:

- Sections 39658, 39659, and 39666, to establish airborne toxic control measures for toxic air contaminants;
- Section 43013, to control pollutants for "off-road or nonvehicle engine categories," including marine vessels "to

12

the extent permitted by federal law,"[3] and to reduce nitrogen oxide emissions from marine vessels;

- Section 41511, to regulate the operators of any air pollution emission source;
- Section 38560 (part of the Global Warming Solutions Act of 2006), to "achieve the maximum technologically feasible and cost-effective greenhouse gas emissions reductions";
- Section 38562 (part of the Global Warming Solutions Act), to adopt limits and reduction measures "by regulation to achieve the maximum technologically feasible and cost-effective reductions in greenhouse gas emissions;" and
- Section 39730.5, to implement a "comprehensive short-lived climate pollutant strategy" to reduce black carbon (i.e., diesel particulate matter) emissions by 50 percent below 2013 levels by 2030.

As discussed, the Regulation requires certain ocean-going vessels to reduce emissions while at berth, primarily through shore power or capture and control systems. (Cal. Code Regs., tit. 17, § 93130.5.) The Regulation caps nitrogen oxides, particulate matter, greenhouse gases, and ammonia emissions from vessels using shore power. (*Id.*, subd. (c).) The Regulation also caps emissions of these gases by vessels using capture and

---

[3] The federal Clean Air Act (42 U.S.C. § 7401 et seq.) preempts some state regulations of emissions from vessel engines (42 U.S.C. § 7543, subd. (e)(2)), but the EPA granted CARB's authorization request for the Regulation under section 209(e) of the Clean Air Act on October 20, 2023. (42 U.S.C. § 7543(e)(2)(A); see *California State Nonroad Engine Pollution Control Standards; Ocean-Going Vessels At-Berth* (Oct. 20, 2023) EPA–HQ–OAR–2023–012; FRL 10787–03–OAR, 88 Fed.Reg. 72461-02.)

control technology, including for tanker auxiliary engines or boilers.  (*Id.*, subd. (d).)

Vessels must comply with the Regulation when they are at a California terminal that received 20 or more annual visits for each covered vessel type in the previous two calendar years. (Cal. Code Regs., tit. 17, § 93130.10, subd. (a).)  When adopted, six ports and terminal areas met those criteria for tankers:

- The ports of Long Beach and Los Angeles, for which compliance for tankers was required by January 1, 2025 (*id.*, § 93130.7, subds. (b)-(c));
- Tanker terminals in the Richmond, Rodeo, Carquinez, and Stockton areas in Northern California, for which compliance was required by January 1, 2027 (*ibid.*).

The Regulation requires compliance for ro-ros at all covered ports and terminals by January 1, 2025.  (*Id.*, subd. (b).)

The Regulation includes several alternative compliance options, besides shore power or capture and control systems, designed to provide some flexibility to regulated entities.

First, the Innovative Concepts compliance option requires the same (or greater) emissions reductions but from alternative sources of emissions at ports and terminals.  (Cal. Code Regs., tit. 17, § 93130.17.)  Applications are published on CARB's website for public comment, and CARB must then evaluate each Innovative Concepts application to determine if it meets all the requirements.  (*Id.*, subd. (b)(2)-(3).)  Innovative Concepts have a maximum compliance period of five years, but CARB may approve applications for an additional period of five years.  (*Id.*, subd. (a)(7).)

Second, regulated entities may pay into a Remediation Fund in lieu of controlling emissions under certain

14

circumstances, including during equipment repairs and construction, or where entities encounter physical or operational constraints delaying implementation of emissions control technology.  (Cal. Code Regs., tit. 17, § 93130.15.)  To be eligible, ports and terminals must have invested in land-side control equipment and vessels must have invested in shore power "or other on-board control equipment." (*Id.*, subd. (b).)  Eligible entities "may request to use the remediation fund . . . if the request is supported by compelling documentation that demonstrates the eligibility of the request." (*Ibid*.)  CARB must approve or deny requests to use the Remediation Fund option. (*Id.*, subd. (d).)

In addition, an Interim Evaluation provision in the Regulation obligated CARB in 2022 to assess the progress in adopting technologies and infrastructure improvements for ro-ro and tanker vessels and terminals.  (Cal. Code Regs., tit. 17, § 93130.14, subd. (d).)  Ports and terminals had to submit information regarding compliance and infrastructure modifications by December 2021.  (*Id.*, subds. (a)-(c).)  CARB was required to consider that information, along with "other public information provided to CARB, including terminal specific engineering evaluations, logistical considerations, public engagement, and independent studies that inform the implementation timeline." (*Id.*, subd. (d).)  CARB was required to issue its analysis and findings by December 1, 2022.  (*Ibid*.)  If CARB found "that the compliance deadlines for ro-ro or tanker vessels need to be adjusted forward or backward in time, the report will include recommendations to initiate staff's development of potential formal regulatory amendments." (*Ibid*.)

There is no requirement that CARB act on any of the recommendations.  (*Ibid*.)

D.    *Superior Court Proceedings*

On September 28, 2020, WSPA filed a verified petition for writ of mandate and declaratory and injunctive relief, asking the superior court to set aside CARB's approval of the Regulation and to enforce compliance with CEQA.  The petition alleged CARB's adoption of the Regulation was arbitrary, capricious, unsupported by the evidence, and contrary to California law.  The petition also alleged CARB failed to comply with the APA and CEQA during the rulemaking process for the Regulation.

Following a hearing on January 11, 2023, the superior court denied WSPA's petition.  On March 1, 2023, the court entered judgment in CARB's favor.  WSPA timely appealed.

**DISCUSSION**

A.    *CARB's Determination That Compliance With the Regulation Was Feasible Did Not Lack Evidentiary Support*
WSPA argues CARB acted arbitrarily and capriciously in adopting the Regulation because CARB failed to prove complying with the Regulation's emissions standards was technologically feasible, as required by Health and Safety Code sections 38560, 39666, and 43013.[4]  Specifically, WSPA argues "the development

---

[4]    WSPA also argues the Regulation does not comply with Health and Safety Code section 39602.5, which requires CARB to adopt measures that are "necessary, technologically feasible, and cost effective" and "can likely be achieved by the compliance date

16

and statewide implementation of new tanker emission [capture and] control technology, or the retrofit or replacement of the entire California tanker fleet and all ports and terminals with shore power capability, cannot be feasibly or safely accommodated by CARB's arbitrarily selected deadlines."[5]

set forth in the rule." However, WSPA's petition and briefing in the superior court did not reference section 39602.5, which pertains to regulations promulgated to achieve the "air quality standards required by the federal Clean Air Act." (Health & Saf. Code, § 39602.5, subd. (a).) WSPA has thus forfeited any argument on appeal with respect to section 39602.5. (See *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1074 [holding appellant forfeited claim by failing to raise it in the underlying superior court proceedings on appellant's petition for writ of mandate].)

[5]     WSPA erroneously contends the superior court examined only whether the emissions control technology could be developed at some point, without regard to the actual compliance deadlines. The court explicitly considered, and rejected, WSPA's argument that "CARB has not demonstrated the timing associated with the Regulation is feasible."

We note that in 2023 the EPA came to the same conclusion as the superior court in evaluating whether "there is inadequate lead time to permit the development of the necessary technology" before the effective date of the emissions standards. (*California State Nonroad Engine Pollution Control Standards; Ocean-Going Vessels At-Berth*, *supra*, 88 Fed.Reg. at pp. 72461, 72463, 72469.) The EPA examined this issue in determining whether to grant a waiver for the Regulation. (*Id.* at p. 72474.) It determined "because CARB has identified a number of existing technologies and a reasonable projection of the development and modification of technologies within the lead time provided, and because opponents of the authorization have not demonstrated why such

17

1. *Standard of review*

WSPA filed its petition for writ of mandate under Code of Civil Procedure section 1085. A writ of mandate will lie to "compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station." (Code Civ. Proc., § 1085.) Code of Civil Procedure section 1085 permits judicial review of an agency's quasi-legislative act of adopting a regulation. (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 460 (*American Coatings*); *Western States Petroleum Assn. v. Bd. of Equalization* (2013) 57 Cal.4th 401, 415 (*WSPA v. Bd. of Equalization*).)

" '[Q]uasi-legislative rules . . . represent[ ] an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly "making law," their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.' " (*WSPA v. Bd. of Equalization*, *supra*, 57 Cal.4th at p. 415, second bracket in original; accord, *American Coatings*, *supra*, 54 Cal.4th at p. 460; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 [recognizing the need for judicial deference to an agency's quasi-legislative actions

projections are unreasonable, the opponents of the authorization have not met their burden of proof to demonstrate technological infeasibility." (*Ibid.*)

18

to respect the separation of powers]; *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654 ["Deferential review of quasi-legislative activity minimizes judicial interference in the interests of the separation of powers doctrine."].)  Thus, our review of the validity of an agency's quasi-legislative regulation is confined to the question whether the classification is arbitrary, capricious, or entirely lacking in evidentiary support.  (*American Coatings*, at p. 460.)  It is WSPA's burden to make this showing.  (*Ibid.*)

To determine whether a regulation is arbitrary, capricious, or lacking in evidentiary support, we must " ' " ' " 'ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " ' " ' " (*American Coatings*, *supra*, 54 Cal.4th at p. 460; accord, *TRC Operating Co., Inc. v. Shabazian* (2024) 100 Cal.App.5th 91, 104.) "It is worth noting that 'the question whether agency action is "entirely lacking in evidentiary support" is not the same as a substantial evidence test.' " (*American Coatings*, at p. 461; accord, *TRC Operating Co., Inc.*, at p. 104.)  The "arbitrary and capricious standard of review" under Code of Civil Procedure section 1085 "is more deferential to agency decisionmaking than the substantial evidence standard," but still " ' "require[s] a *reasonable basis* for the decision." ' " (*American Coatings*, at p. 461.)  "This limited judicial review is further constrained by the recognition that '[i]n technical matters requiring the assistance of experts and the study of marshaled scientific data . . . courts will permit administrative agencies to work out their problems with as little judicial interference as possible.' " (*Western States Petroleum Assn. v. South Coast Air Quality*

19

*Management Dist.* (2006) 136 Cal.App.4th 1012, 1018 (*WSPA v. SCAQMD*).)

### 2. *Relevant legal framework*

The air pollution statutes under which CARB promulgated the Regulation require that emissions control measures be achievable and technologically feasible. (See Health & Saf. Code, §§ 39666, subd. (c) [air pollution control measures "shall be designed . . . to reduce emissions to the lowest level *achievable* through application of *best available control technology*"], italics added; 38560 [CARB "shall adopt rules and regulations . . . to achieve the maximum *technologically feasible* and cost-effective greenhouse gas emission reductions"], italics added; 43013, subd. (a) [mobile source emission regulations must be "necessary, cost effective, and *technologically feasible*"], italics added.)

On appeal, WSPA does not contest that CARB could lawfully set emissions limits based on technologies that do not currently exist—referred to as "technology-forcing" standards—so long as those technologies are reasonably anticipated to exist by the compliance deadline. Indeed, any other position would be futile, given the reasoning of *American Coatings*, *supra*, 54 Cal.4th 446, which reviewed an agency's actions under Health and Safety Code section 40440, a similar air pollution standard to those implicated here. Health and Safety Code section 40440, subdivision (b)(1), in pertinent part, mandated that the South Coast Air Quality Management District Board's regulations for paint emissions require "the use of best available retrofit control technology for existing sources." (*American Coatings*, at p. 462.) The phrase "best available retrofit control technology" was defined as "an emission limitation that is based on the maximum degree of reduction achievable" (Health & Saf. Code, § 40406), a

20

standard that the Supreme Court held encompassed technology that did not yet exist but was "capable of being achieved" by the regulation's implementation date. (*American Coatings*, at p. 463.) Accordingly, the court held regulations promulgated under section 40440 " 'may force companies to implement technology if there is a showing that implementation is achievable by the effective date' of the regulation." (*American Coatings*, at p. 464.) The agency "need not consider only existing technology in determining whether an emissions reduction is achievable; it may also take into account reasonably foreseeable technological advances" in setting emissions limits. (*Id.* at p. 473.)

The Supreme Court explained that pollution control laws and standards often need to be "technology-forcing" because "industry generally has insufficient incentive to develop or adopt new pollution control technology in the absence of regulation." (*American Coatings*, *supra*, 54 Cal.4th at p. 466; see *Union Electric Co. v. EPA* (1976) 427 U.S. 246, 256-257 [explaining federal Clean Air Act's air pollution standards are "of a 'technology-forcing character,' [citation], and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible"].) In *American Coatings*, the agency relied on staff reports, a survey of product data sheets from coatings manufacturers, and studies by outside consultants to conclude "potential or developing technology . . . will enable compliance with emissions limits by the effective date of the regulation." (*American Coatings*, at p. 469.) As such, the agency's promulgation of the air pollution regulation was not arbitrary, capricious, or entirely lacking in evidentiary support.

(*Id*. at pp. 457, 470-471.)[6]

Although WSPA does not contest that vessels and ports are properly subject to regulations adopting technologically feasible emissions standards, it asserts the development and statewide implementation of measures to meet the Regulation's new standards cannot feasibly be done by the relevant deadlines. WSPA contends the record does not support CARB's conclusion that the necessary capture and control and shore power technology and infrastructure can be ready in time, and WSPA argues regulated entities would need many more years to develop and implement them.

> 3. *WSPA has not demonstrated CARB's determination regarding the feasibility of capture and control technology for tankers lacked evidentiary support*

WSPA argues CARB set an unrealistic deadline for capture and control technology for tankers to be ready, failing to account for the time required to design, engineer, test, and mass produce the necessary technology for statewide use. WSPA asserts

---

[6] WSPA argues that CARB must satisfy a three-prong test outlined in *Natural Resource Defense Council v. U.S., etc.* (D.C. Cir. 1981) 655 F.2d 318, 332 (*NRDC*), which was cited in *American Coatings*, *supra*, 54 Cal.4th at page 468. However, in *American Coatings*, the California Supreme Court did not adopt *NRDC*'s test, and relied on *NRDC* only for its unremarkable observation that agencies' predictions about technological progress in setting environmental regulations are " ' "subject to the restraints of reasonableness." ' " (*American Coatings*, at p. 468, quoting *NRDC*, *supra*, 655 F.2d at p. 328.) We follow the analytical framework in *American Coatings* and decline to apply *NRDC*'s three-prong approach.

22

compliance became even more infeasible when CARB accelerated the Regulation's deadlines for tankers to 2025 for the Ports of Los Angeles and Long Beach and 2027 for all other ports and terminals. However, WSPA fails to meet its burden to show CARB's determination the technology would be ready was "entirely lacking in evidentiary support." (*American Coatings*, *supra*, 54 Cal.4th at p. 460.)

CARB assessed that 21 capture and control systems would be needed by 2027 at the various covered ports and terminals. When CARB was considering adopting the Regulation, capture and control technology already existed for vessels other than tankers. Two barge-based systems, Maritime Emissions Treatment System and AMECS, designed by CAEM and AEG, respectively, had been used successfully by container vessels at the Ports of Long Beach and Los Angeles. CAEM and AEG stated that similar technology could be safely adapted for tankers.

In response to CARB's question whether CAEM could produce the Maritime Emissions Treatment System and ShoreKat system "to meet the demand that CARB staff anticipates between 2021 and 2029," CAEM responded, "Yes," and stated it had "established relationships with vendors that have sufficient capacity and experience to produce the required types of equipment and in the required quantities and timeframe necessary." For example, CAEM explained its "vision of tanker and cruise ship systems involves an integrated product which combines the extraction and treatment system into one system." CAEM then provided figures that demonstrated an example of such a system and explained it was partnering with the companies that designed and built those systems, several

hundred of which existed worldwide.  CAEM described that the systems depicted in the figures "include high velocity gas extraction and filtration technologies and are of a similar size that would accommodate tanker emissions and smaller cruise ships."  CAEM asserted that the systems it depicted "incorporate many of the components already utilized in [the Maritime Emissions Treatment System] and ShoreKat [system], and would be modified utilizing ceramic filter technology in order to be customized for the extraction and treatment of exhaust from ships while at berth."  It noted that it had already implemented the ceramic filter technology in California in other industries that require "flow and performance for [particulate matter] and [nitrogen oxide] reductions that would be equivalent to the flows required for cruise ship applications."

CAEM also explained how its affiliates had "adapt[ed] existing technology to unique applications for several decades" and provided recent examples of capturing "combustible gases" that were once considered "impractical from a complexity and safety perspective" but were now common in California ports.  CAEM further detailed how its existing Maritime Emissions Treatment System and ShoreKat system could be adapted for tankers by an "increase in size for which the designs are being developed."  Although CAEM responded to CARB's initial proposed 2029 deadline, it also estimated it could deploy a mix of types of capture and control systems by certain years: 30 by 2025, 50 by 2027, and 70 by 2029.  CAEM committed to developing and growing its staff to be able to respond to "project development, management of the outside vendors, and ongoing support of the systems once installed, in terms of service, maintenance, and parts."

WSPA makes several arguments why we should disregard CAEM's guarantee, including that CAEM "only committed to 2025 deliveries of control systems for *ro-ro* vessels, not for tankers . . . , (2) conceded that a 'hazard and operability' study would be required before any system could even be developed for a tanker, and (3) only promised to deliver by 2025, 2027 and 2029 control systems for 'a mix of all types' of vessels," not for tankers specifically.

The record does not support WSPA's claims. First, CAEM addressed both "roll-on/roll-off and tanker vessels [as they] phase into the [R]egulation in 2025 and 2027/2029." Second, CAEM acknowledged a past hazard and operability study that was several years old, and stated, "The path forward to accommodate the tanker fleet would need to include a generic [hazard and operability] study that examines all of the possible system configurations, and a system specific . . . study for each system that is part of the detailed design process." Thus, while CAEM acknowledged that a hazard and operability study would be part of the design process, it provided an assurance of compliance by the Regulation's deadlines, factoring in the need for such a study. Third, although CAEM provided estimates for mixed systems and not just tanker-specific systems, CARB could reasonably assume the need for tanker-specific systems would be met given the total number of systems all providers estimated they could produce and CARB's assessment that 21 capture and control systems would be needed by 2027.

Another provider, AEG similarly explained that it was "confident" it could safely connect its AMECS barge-based capture and control system, which it had vetted for use in Texas, to a tanker. AEG submitted a presentation and diagrams to

25

show how AMECS could be adapted for tankers. AEG explained that it had a "spud barge design" that could "safely attach to [tanker] vessels and allow them to safely conduct their pumping operations."

AEG also provided a letter in October 2019 identifying its technology partners, which were assisting AEG in building the barge that AEG planned to deploy in May 2020 for testing of capture and control of boiler emissions. AEG noted that it would begin testing its technology on "tanker auxiliary engines, as well as capture and control of their boiler emissions while at berth or at anchor. We are also excited to begin testing with our new Spud barge design in the near future." Regarding tankers specifically, AEG stated, "We have met with engineers, from Exxon Mobil, Plains, Chevron, and BP[,] we have held several symposiums, meetings, [and] tours of current AMECS-1, we hired classification society groups . . . to provide AEG, LLC with risk assessment analysis consisting of scenarios with AMECS Barge coming along side [t]ankers while conducting loading and unloading cargo operations, and while connecting to auxiliary and boiler stacks." AEG continued that "after many years of discussions ExxonMobil has vetted our AMECS Barge mounted system and we are confident we can connect to a liquid bulk [tanker] vessel safely." AEG planned to use its "technical team, all data, experience and lessons learned over the past several years on container vessels, as well as our early testing with capturing and controlling emissions from multiple aux[iliary] and boiler stacks simultaneously on Break Bulk vessels and complete the design of an AMECS Spud barge for use on tankers."

AEG stated it was prepared to deal with growing demand and was "confident [it] now ha[d] the technical expertise to not

only meet but exceed the need of industry as [ro-ros], [t]ankers, [and] [reefers] are included in the upcoming regulation and as it incrementally increases." AEG anticipated that, "with suitable financing," it could deploy five barge-based systems by 2021, an additional 14 by 2025, and six more dock based or barge-based units by 2027-2028 "comfortably."[7]

In sum, both CAEM and AEG provided specific details on how capture and control systems could be adapted for tankers, along with projected deployment timelines. Even if their initial estimates pertained to deadlines of 2027 and 2029, their assurances indicated compliance could be achieved by 2025 and 2027. Contrary to WSPA's arguments, the fact that these letters predated CARB's decision to accelerate the Regulation's deadlines is not significant; these vendors' representations about compliance by 2025 and 2027 informed CARB's decision to move the deadlines up. WSPA has not shown CARB acted capriciously in relying on the assurances from CAEM and AEG that the estimated need for capture and control systems would be met by the first compliance deadline of 2025.[8]

---

[7] A third provider, EnviroCare, also indicated its commercially available scrubber system could be adapted for tankers with "no technical hurdle."

[8] WSPA asks us to take judicial notice of the contents of CARB's "At Berth Regulation Executive Orders" webpage on its website, along with two letters from CARB concerning CARB's revocation of executive orders that permitted the use of the AMECS and ShoreKat systems. All the referenced documents reflect actions taken by CARB after the adoption of the Regulation. We note the contents of the webpage referenced by WSPA have changed since WSPA moved for judicial notice. (See

Nor has WSPA demonstrated that CARB failed to adequately consider the time required for the construction of infrastructure needed to support new capture and control technology. In its Final Statement of Reasons, CARB evaluated multiple terminal and port construction projects to assess the feasibility of emissions control systems. In response to a comment that CARB had not accounted for the need for

---

<https://ww2.arb.ca.gov/berth-regulation-executive-orders> [as of February 10, 2025] archived at <https://perma.cc/U84T-X3K8>.)

WSPA contends that judicial notice is appropriate as these are "official acts" of California's executive branch and constitute facts "not reasonably subject to dispute and . . . capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subds. (c), (h).) WSPA argues these documents are relevant to whether CARB acted arbitrarily, capriciously, and without evidentiary support in determining the required tanker emissions control technology would be available by the Regulation's accelerated 2025 and 2027 deadlines.

We decline to take judicial notice of these documents. Because they postdate CARB's approval of the Regulation, they have no bearing on whether CARB acted arbitrarily or capriciously at the time of its decision. (See *American Coatings*, *supra*, 54 Cal.4th at p. 460 ["Because we address the validity of the amendments as adopted in 2002, we consider only the administrative record before the agency at that time."]; *Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 574, fn. 4 [it is generally improper to take judicial notice of evidence that "(1) is absent from the administrative record, *and* (2) was not before the agency at the time it made its decision"]; *San Diegans for Open Government v. City of San Diego* (2016) 6 Cal.App.5th 995, 1002, citing Evid. Code, §§ 350, 452, subd. (c), 459.)

"substantial new wharf infrastructure" in its projected timelines, CARB disagreed, stating that the Regulation would not necessarily require major wharf upgrades or the "extended timeline that a large-scale wharf reconstruction project would require." CARB also noted the commenter disregarded simpler infrastructure projects with shorter timelines, which would reduce the average completion time to between three and nine years, with an average of 4.6 years, rather than the seven to 15 years the commenter claimed the projects would take.

Although WSPA points to its own members' analysis that the compliance deadlines were infeasible, the fact that some experts disagreed with CARB's assessment that the deadlines were realistic does not render CARB's analysis arbitrary or lacking evidentiary support. *WSPA v. SCAQMD*, *supra*, 136 Cal.App.4th 1012 is instructive. This court addressed whether the regulation at issue set an emissions standard that was "achievable" for oil refineries. (*Id*. at p. 1019.) The air quality management district had based the emissions standard on test results from only one of six affected oil refineries. (*Ibid*.) We rejected WSPA's argument that, given differences among the refineries, the one refinery's test results were "not a fair indication" that the other five refineries could comply with the new standard. (*Ibid*.) Although WSPA's experts disagreed with the district's consultant that the emission reductions were feasible at all the affected refineries, "it was up to the District's board to decide which expert's opinion to accept." (*Id*. at p. 1020.) Similarly, here, WSPA's disagreements with CARB's "expert technical judgments concerning . . . achievable emissions limits . . . do not establish that [CARB's] regulations were arbitrary, capricious, or entirely lacking in evidentiary support." (*American*

*Coatings, supra*, 54 Cal.5th at p. 478.)

4. *WSPA fails to establish no reasonable evidence supported CARB's conclusion that shore power technology for tankers was technologically feasible by the Regulation's deadlines*

WSPA also asserts CARB could not reasonably anticipate the capability of tankers to use shore power by the 2025 deadline. WSPA again fails to satisfy its burden to show CARB's conclusion lacked evidentiary support.

CARB relied on the fact that shore power has been used safely and successfully by at least two tankers for electricity at the Port of Long Beach since 2009, as well as by other vessels at California ports and terminals. WSPA argues these two examples of tankers using shore power are not representative of the "vast majority" of the tanker fleet because the two tankers were diesel-electric vessels specifically designed for shore power use. CARB acknowledged that "not every tanker and tanker berth in California would be able to utilize shore power in the same way," but emphasized these examples demonstrated shore power was a feasible strategy for reducing emissions from tankers.

WSPA points to the facts that CARB acknowledged that the tanker industry had showed a "lack of interest" in shore power, and that CARB itself voiced an expectation that most tankers would opt for capture and control systems instead. WSPA suggests CARB's forecast that shore power would be a less popular option for tankers undermines CARB's determination that shore power was a viable option for tankers. But the tanker industry's likely preference for one compliance method over another does not render shore power *infeasible* for all tankers.

30

Given that shore power has been successfully used by some tankers, CARB's reliance on it as a compliance option for tankers was not arbitrary, capricious, or entirely lacking in evidentiary support. (See *American Coatings*, *supra*, 54 Cal.4th at p. 473 [agency reasonably determined regulation's standards were achievable within four years, even if only a small percentage of product categories complied with stricter emissions limits when regulation was adopted]; *WSPA v. SCAQMD*, *supra*, 136 Cal.App.4th at pp. 1019-1020 [existence of an oil refinery with technology that WSPA claimed could not be replicated at other refineries demonstrated enough support for conclusion that a regulation's emission standard was feasible].)

WSPA correctly claims that "virtually all tankers visiting California ports use boilers that *cannot* be electrified" and thus cannot be powered by connecting to shore power. However, even if tankers cannot use shore power to run their boilers, they still could feasibly connect to shore power to generate electricity for their electrical needs, such as powering lights and ballast pumps, which are otherwise typically powered by the vessels' auxiliary engines that run on diesel. Indeed, the Regulation specifically provides that when a tanker uses shore power in lieu of its auxiliary engine, it does not need to curb emissions from its boiler. (Cal. Code Regs., tit. 17, § 93130.5, subd. (d)(2) [addressing emission caps for boilers for "tanker vessels with steam driven pumps, *unless the tanker is using shore power to reduce emissions from auxiliary engines*"].) As CARB notes, "the argument that shore power cannot be used to power *boilers* or curb *boiler* emissions is beside the point, as shore power can be used for and curbs emissions from tankers' auxiliary *engines*." As CARB explained in its Initial Statement of Reasons, although

31

boiler emissions make up most of the tanker at berth emissions statewide, use of shore power by tankers in lieu of their auxiliary engines is still beneficial because it "eliminates all on-site auxiliary engine emissions while the vessel is at berth, including cancer-causing [diesel particulate matter] emissions. It also offers the opportunity to significantly reduce [greenhouse gas] emissions, because California law requires increased use of renewable power sources over time, resulting in a progressively cleaner electricity grid that has a lower carbon footprint than burning liquid fuel onboard a vessel." In the Final Statement of Reasons, CARB further detailed, "Requiring emissions reductions from both auxiliary engines and boilers could result in redundant technologies for shore power equipped vessels, with vessels using shore power to reduce auxiliary engine emissions as well as a bonnet type capture and control system to reduce the boiler emissions." Accordingly, shore power remains a feasible means of compliance with the Regulation.

WSPA also asserts that timelines to develop land-side shore power infrastructure "*alone* typically ran four to five years, and that is without any time for development, testing and construction of tanker vessel retrofits or new tanker vessels with shore power capability." However, CARB highlighted that the shore power project at the Port of Long Beach—"including 'analysis' of shore power's viability, port 'infrastructure' changes, and 'extensive testing' "—took only four years to complete. Additionally, CARB analyzed other projects that involved upgrading infrastructure for shore power, which similarly took around five years to complete. While WSPA points to evidence suggesting that shore power might take longer to implement, CARB reasonably relied on contrary data. WSPA has not shown

CARB's determination that shore power was a feasible path to compliance for some tankers was arbitrary or entirely lacking in evidentiary support.[9]

B.  *CARB Substantially Complied With the APA in Promulgating the Regulation*

WSPA contends CARB violated its statutory duties under the APA during the rulemaking process for the Regulation by delaying public disclosure of CARB's own commissioned study, the CE-CERT Report, which, WSPA contends, showed CARB "drastically overstated" the level of emissions from marine

---

[9]     The Regulation also includes several mechanisms that provide flexibility in compliance methods, further supporting the conclusion that CARB's adoption of the Regulation did not foist unreasonable technological requirements on regulated entities. First, the Regulation's Innovative Concepts option allows entities to use alternative means of reducing emissions from other sources at ports or terminals, so long as entities achieve the same or greater level of emissions reductions. (Cal. Code Regs., tit. 17, § 93130.17.) Second, the Regulation allows regulated entities to pay into a Remediation Fund in lieu of controlling emissions under certain circumstances. (*Id.*, § 93130.15.) Finally, the Regulation set up an Interim Evaluation process, which allowed regulated entities to submit progress information to CARB and required CARB to assess the ongoing adoption of control technologies for tankers and ro-ros as well as the status of the necessary land-side infrastructure improvements to support emissions control measures. (*Id.*, § 93130.14; see *WSPA v. SCAQMD*, *supra*, 136 Cal.App.4th at p. 1021 [the "availability of three 'escape routes' from the rule's emission standards" and the agency's agreement to monitor progress and make any necessary adjustments supported finding of reasonableness of regulation].)

33

tankers.[10]

"' "Agencies are not normally delegated power to determine authoritatively whether they complied with generally applicable rule-making procedures. . . . As a result, courts may usually determine the lawfulness of agencies' compliance with those rule-making procedures entirely de novo, simply substituting their judgment on that question for that of the agencies." ' " (*Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1071 (*Sims*).)

"The APA subjects proposed agency regulations to certain procedural requirements as a condition to their becoming effective." (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 332; see Gov. Code, § 11346, subd. (a).) As relevant here, " '[n]o state agency shall issue . . . or attempt to enforce . . . a regulation' without complying with the APA's notice and comment provisions. (Gov. Code, § 11340.5, subd. (a).)." (*Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 434; see Health & Saf. Code, § 39601, subd. (a) [subjecting CARB to APA requirements when adopting regulations].)

The APA required CARB to "maintain a file" of its rulemaking for the Regulation that included "[a]ll data and other factual information, *any studies or reports*, and written comments submitted to the agency in connection with the adoption, amendment, or repeal of the regulation." (Gov. Code, § 11347.3, subds. (a), (b)(6), italics added.) Documents sent to an agency by

---

[10] WSPA contends CARB did not release the Report until after WSPA asked for it multiple times, but WSPA does not point to any evidence in the record showing it had requested the Report from CARB.

34

its hired consultants must be included in the rulemaking file. (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 751-754 (*POET, LLC*).) "Commencing no later than the date that the notice of the proposed action is published in the California Regulatory Notice Register, and during all subsequent periods of time that the file is in the agency's possession, the agency shall make the file available to the public for inspection and copying during regular business hours." (Gov. Code, § 11347.3, subd. (a); see also Health & Saf. Code, § 39601.5 [mandating that CARB make available to the public information related to air emissions before the comment period for a regulation]; see, e.g., *Sims*, *supra*, 216 Cal.App.4th at pp. 1068, 1071 [affirming superior court's ruling that agency violated Government Code section 11347.3 by withholding rulemaking file until six weeks after notice of proposed action and less than three weeks before comment period closed, and by failing altogether to include in the file several significant documents upon which agency relied].)

A "regulation or order of repeal may be declared to be invalid for a substantial failure to comply" with the APA. (Gov. Code, § 11350, subd. (a); see *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 303.) " 'Failure to comply with every procedural facet of the APA, however, does not automatically invalidate a regulation. A court may declare the regulation invalid only for . . . "substantial failure" to comply with the act. (Gov. Code, § 11350, subd. (a).)' " (*WSPA v. Bd. of Equalization*, *supra*, 57 Cal.4th at p. 426; accord, *POET, LLC*, *supra*, 218 Cal.App.4th at p. 755.) Where an agency substantially complies with respect to the " ' " ' "substance essential to the reasonable objectives of the statute[,]" . . .

technical deviations are not to be given the stature of noncompliance. . . . Substance prevails over form.' " ' " (*POET, LLC*, at p. 755; accord, *WSPA v. Bd. of Equalization*, at p. 426; *American Chemistry Council v. Department of Toxic Substances Control* (2022) 86 Cal.App.5th 146, 192.)

CARB published the Notice of Proposed Action for the Regulation on August 28, 2018. In 2019, CARB commissioned CE-CERT to conduct a study evaluating tanker emissions while off-loading fuel at berth. CE-CERT produced its findings in a "Draft Final Report" dated March 2020. CARB made the Report available to WSPA in early July 2020. The second review and comment period commenced July 10, 2020, and ended on July 27, 2020. The public hearing was held on August 27, 2020. WSPA provided comments to CARB regarding the Report during the second comment period and provided both written and oral comments at the hearing on August 27, 2020. CARB addressed these comments in its Final Statement of Reasons.

The Report was a study or report submitted to CARB in connection with the adoption of the Regulation. (Gov. Code, § 11347.3, subds. (a), (b)(6); *POET, LLC, supra*, 218 Cal.App.4th at pp. 751-754.) As such, CARB was required to add it to the rulemaking file for the Regulation and ensure it was available to the public. (Gov. Code, § 11347.3, subd. (a); see Health & Saf. Code, § 39601.5.) Because CARB did not commission the CE-CERT study until *after* it issued the Notice of Proposed Action in 2018, CARB could not comply with the requirement to add the Report "no later than the date that the notice of the proposed action is published." (Gov. Code, § 11347.3, subd. (a).) However, it had an obligation to ensure that the Report was timely added to the rulemaking file once received from CE-CERT. (See *ibid*.)

Although WSPA asserts there was a four-month delay before CARB made the Report available, the record does not contain information about when exactly CE-CERT provided the Report to CARB. WSPA relies on the facts that the Report bore a March 2020 date and that WSPA did not have access to the Report until early July 2020. But even assuming that CARB received the Report in March 2020 and failed to timely add it to the rulemaking file, thereby violating Government Code section 11347.3, the Regulation is not "automatically render[ed] invalid." (*POET, LLC*, *supra*, 218 Cal.App.4th at p. 755.)

CARB "substantially complie[d]" with its obligation under Government Code section 11347.3 to make information pertaining to the Regulation available to the public. (*POET, LLC*, *supra*, 218 Cal.App.4th at p. 755.) CARB released the Report before the end of the second comment period, allowing WSPA to provide comments regarding the Report both during that comment period and at the final hearing. CARB thus fully complied with its obligation under Health and Safety Code section 39601.5 to make the Report available before the comment period ended. WSPA does not suggest that the delay in receiving the Report stymied it from expressing its concerns to CARB, and CARB had the opportunity to consider and respond to WSPA's comments regarding the Report's conclusions. Further, despite the file exceeding 60,000 pages and the rulemaking process spanning several years, the delay in adding the Report to the rulemaking file is the only alleged APA violation by CARB that WSPA identifies. Given these circumstances, even assuming a violation of Government Code section 11347.3, we would not

declare the Regulation invalid.[11]  (See *POET, LLC*, *supra*,
218 Cal.App.4th at p. 755; cf. *Sims*, *supra*, 216 Cal.App.4th at
pp. 1067-1070, 1074-75 [combined effect of multiple violations of
APA notice and comment provisions constituted substantial
failure to comply where effect of violations was to mislead the
public about information relied on by agency in developing
regulations for carrying out death penalty by lethal injection].)

C.     *CARB Did Not Violate CEQA*

WSPA contends CARB violated CEQA when it adopted the
Regulation because it failed to adequately analyze and mitigate
(1) environmental impacts, specifically safety hazards, associated
with the Regulation's compliance methods, and (2) the
cumulative impacts of the Regulation on the environment.

---

[11]     To the extent WSPA claims CARB committed a substantive
violation of law by relying on data that showed significantly
higher tanker emissions than were shown in the CE-CERT study,
WSPA has not articulated a cogent argument on appeal and has
forfeited the argument.  (See *South Lake Tahoe Property Owners
Group v. City of South Lake Tahoe* (2023) 92 Cal.App.5th 735,
758; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019)
36 Cal.App.5th 142, 153.)  In any event, in its Final Statement of
Reasons, CARB expressed valid concerns with the Report,
including that the Report only studied a new and
unrepresentative type of tanker and that the draft Report had
not yet been peer reviewed and verified.  CARB explained in
detail its rationale for relying on a different data set showing
greater emissions.  CARB thus documented that it considered the
relevant information and demonstrated a "rational connection"
between the information, the agency's decision, and the purposes
of the statutes under which the Regulation was promulgated.
(See *American Coatings*, *supra*, 54 Cal.4th at p. 460.)

WSPA does not establish any CEQA violations by CARB.

### 1. *Standard of review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), quoting Pub. Resources Code, § 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard*, at p. 426.) " 'Substantial evidence challenges are resolved much as substantial evidence claims in any other setting: a reviewing court will resolve reasonable doubts in favor of the administrative decision, and will not set aside an agency's determination on the ground that the opposite conclusion would have been equally or more reasonable.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 (*Sierra Club*).) "Where the alleged defect is that the agency has failed to proceed in the manner required by law, the court determines de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated requirements." (*Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 845.)

### 2. *Legal framework for abbreviated CEQA review of a regulation setting emissions standards*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112

(*Mountain Lion*).) "In general, CEQA 'requires various state and local governmental entities to submit environmental impact reports before undertaking specified activity. These reports compel state and local agencies to consider the possible adverse consequences to the environment of the proposed activity and to record such impact in writing.' [Citations.] 'Under CEQA, the "lead agency . . . is responsible for conducting an initial study of the project to determine whether it may have a significant effect on the environment. If it is found that the project will have no significant effect on the environment, a negative declaration is prepared, describing the project and indicating that it will have no significant effect." [Citation.] On the other hand, if the initial study indicates that the project may have a significant effect on the environment, the lead agency must prepare an [environmental impact report (EIR)]. . . . The EIR must include a detailed statement concerning the environmental effects, alternatives and other relevant factors concerning the project.' " (*Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 238-239.)

CARB, however, "is not subject to the full scope of CEQA. Rather, it utilizes its own regulatory program when adopting or amending standards for the protection of ambient air quality. This process is permitted under the law as a certified regulatory program. (See Pub. Resources Code, § 21080.5; Cal. Code Regs., tit. 14, §§ 15250-15252.[12]) Such programs are exempt from certain procedural aspects of CEQA because 'they involve "the

_____

[12]    We refer to the Guidelines for the Implementation of the California Environmental Quality Act, found in the California Code of Regulations, title 14, section 15000 et seq., as "Guidelines."

40

same consideration of environmental issues as is provided by use of EIRs and negative declarations." ' [Citation.]  Certification of a program is effectively a determination that the agency's regulatory program includes procedures for environmental review that are the functional equivalent of CEQA.  [Citation.]  'The practical effect of this exemption is that a state agency acting under a certified regulatory program need not comply with the requirements for preparing initial studies, negative declarations or EIR's [sic].' " (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 94-95 (*John R. Lawson*); accord, *Friends, Artists & Neighbors of Elkhorn Slough v. California Coastal Com.* (2021) 72 Cal.App.5th 666, 693 ["The certified regulatory program 'involv[es] essentially the same consideration of environmental issues as is provided by use of EIRs and negative declarations.' "]; *Coalition for Reasonable Regulation of Naturally Occurring Substances v. California Air Resources Bd.* (2004) 122 Cal.App.4th 1249, 1265; see Pub. Resources Code, § 21080.5, subd. (c); Guidelines, §§ 15250, 15251, subd. (d) [designating CARB's regulatory program as a certified program].)  The standards of review set forth above apply when reviewing CEQA compliance of agency action taken under a certified regulatory program like CARB's.  (*John R. Lawson*, at p. 96; *POET, LLC*, *supra*, 218 Cal.App.4th at p. 712.)

Actions taken by CARB generally " 'remain subject to other provisions of CEQA.' " (*John R. Lawson*, *supra*, 20 Cal.App.5th at p. 95; accord, *Mountain Lion*, *supra*, 16 Cal.4th at p. 114 [although agency operating pursuant to a certified regulatory program is not required to prepare an EIR, agency is still required to "comply with all of CEQA's other requirements"]; see also *POET, LLC*, *supra*, 218 Cal.App.4th at pp. 709-711.)  For

41

instance, CARB must adhere to "the policy of avoiding significant adverse effects on the environment where feasible." (Guidelines, § 15250.)

Here CARB prepared an environmental analysis (the Regulation EA) "in lieu of" an EIR. (Pub. Resources Code, §§ 21080.5, subd. (a), 21159; see *Mountain Lion*, *supra*, 16 Cal.4th at p. 113 [a state agency operating a certified regulatory program "generate[s] a[n] . . . environmental review document that serves as a functional equivalent of an EIR"]; Cal. Code Regs., tit. 17, §§ 60004, subd. (b), 60004.2; Guidelines, § 15187.) The parties agree CARB's obligations with respect to preparing the Regulation EA were subject to special provisions of CEQA. These provisions apply specifically to regulations CARB promulgates to set "performance standards" and to require "the installation of pollution control equipment," including under the Global Warming Solutions Act of 2006, Health and Safety Code section 38500 et seq. (Pub. Resources Code, §§ 21159, subd. (a), 21159.4, subd. (a)(1) [listing CARB as a qualifying agency under § 21159]; Guidelines, § 15187.) The provisions are contained in an article in the Public Resources Code entitled "Expedited Environmental Review for Environmentally Mandated Projects."

Public Resources Code section 21159 sets forth the special requirements for an environmental analysis completed for an expedited review of a regulation to set emissions limits to address air pollution. It provides that the environmental analysis must address "the reasonably foreseeable methods of compliance" with the Regulation. (Pub. Resources Code, § 21159.) "The environmental analysis shall, at minimum, include all of the following: [¶] (1) An analysis of the reasonably foreseeable environmental impacts of the methods of compliance. [¶] (2) An

42

analysis of reasonably foreseeable feasible mitigation measures. [¶] (3) An analysis of reasonably foreseeable alternative means of compliance with the rule or regulation." (*Id.*, subd. (a)(1)-(3); see Guidelines, § 15187.) "The environmental analysis shall take into account a reasonable range of environmental, economic, and technical factors, population and geographic areas, and specific sites" (Pub. Resources Code, § 21159, subd. (c).), but "[t]his section does not require the agency to conduct a project-level analysis" (*id.*, subd. (d); Guidelines, § 15187, subd. (e)). "[T]he agency may utilize numerical ranges or averages where specific data is not available; however, the agency shall not be required to engage in speculation or conjecture." (Pub. Resources Code, § 21159, subd. (a).)

### 3. *CARB's "tiered" approach for the Regulation EA*

The Regulation EA was part of a "tiered" approach taken by CARB to disclose and address potential environmental impacts generally associated with the state's mandate to address air pollution, and then, more specifically, the impacts reasonably foreseen as entities subject to the Regulation take actions to enable their vessels, ports, and terminals to meet the emissions standards. (See Pub. Resources Code, §§ 21068.5, 21093, 21094; Guidelines, §§ 15152, 15385; Cal. Code Regs., tit. 17, § 60004, subd. (g) [providing "CARB may tier its environmental analyses"].)[13] At least three "tiers" of environmental analysis

---

[13] " ' "Tiering" refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the

43

were contemplated by CARB before the actual implementation of measures to satisfy the Regulation's emissions standards: (1) the environmental analysis prepared in connection with the 2016 State Implementation Plan (SIP), the SIP EA;[14] (2) the 2020 Regulation EA; and (3) the future site-specific, "project-level" environmental analyses for the various compliance measures undertaken to meet the Regulation's standards.

When a lead agency uses a tiered process in connection with an environmental review for a " 'large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in

---

later EIR or negative declaration solely on the issues specific to the later project.' " (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 730, quoting Guidelines, § 15152, subd. (a).)

[14] The contents of the SIP EA, which are incorporated by reference in the Regulation EA, are discussed by WSPA in its reply brief, and WSPA provides a now outdated link to the SIP EA on the California Natural Resources Agency website. The SIP EA is not included in the administrative record, even though it was "Appendix B" to the 2016 SIP, which *is* part of the record. We treat WSPA's discussion of the SIP EA as a request to take judicial notice of it. (See *People v. Morales* (2018) 25 Cal.App.5th 502, 511, fn. 7.) Judicial notice is properly taken of this official document, which is currently found on CARB's website at <https://ww2.arb.ca.gov/sites/default/files/classic/planning/sip/2016sip/rev2016statesip_ceqa.pdf> [as of February 10, 2025] as archived at <https://perma.cc/7LQH-RH79>. (See Evid. Code, § 452, subd. (c); *Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752.)

connection with a project of a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand.' ([Guidelines,] § 15152, subd. (c).)" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1170 (*Bay-Delta*).) "[A] *program* EIR . . . is a type of EIR that agencies often use to examine a broad program or plan that will be followed by more narrow, related projects, which can be analyzed in more focused CEQA documents that 'tier' from the program EIR." (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 236; see Guidelines, § 15168.) A *project-level* environmental analysis "examines the environmental impacts of a specific development project." (Guidelines, § 15161; see *Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 730; *Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 172 ["Adoption of a program EIR allows for 'tiering,' in which a program EIR 'cover[s] general matters and environmental effects' and is followed by 'narrower or site-specific' EIRs as needed."].) " 'Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental effects of the project and does not justify deferring such analysis to a later tier EIR or negative declaration.' ([Guidelines,] § 15152, subd. (b).) Tiering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases." (*Vineyard*, *supra*, 40 Cal.4th at p. 431; accord, *Bay-Delta*, *supra*, 43 Cal.4th at p. 1170.)

CARB prepared the SIP EA in connection with the 2016

SIP, a statewide plan for meeting federal air quality standards. The broad, program-level SIP EA identified potential environmental impacts, project alternatives, and mitigation measures for impacts associated with the numerous possible measures to address air pollution. (See SIP EA.) Amendments to the Existing At-Berth Regulation were one of the "plan concepts and reasonably foreseeable compliance responses" contemplated as a result of implementation of the SIP. (*Id.* at pp. 27-30.)

Next, the Regulation EA "tiered off" the SIP EA, as it went into further detail regarding the environmental effects specifically resulting from the Regulation. However, CARB indicated that the Regulation is "programmatic" and "a broad regulatory program," and thus a "general level of detail" in the Regulation EA was "appropriate." CARB explained that "[w]hile the general locations of ports in California which may be covered under the Proposed Regulation are known, decisions by the regulated entities regarding compliance options and the precise location of the many components covered in the Proposed Regulation are unknown. Furthermore, attempting to predict decisions by entities regarding the specific location and design of infrastructure undertaken in response to implementation of the Proposed Regulation would be speculative (if not impossible) at this early stage, given the influence of other business and market considerations in those decisions. As a result, there is some inherent uncertainty in the degree of mitigation that would ultimately need to be implemented to reduce any potentially significant impacts identified in this [Regulation] EA." The Regulation EA stated CARB did not analyze site-specific impacts given the location of future facilities or other infrastructure changes were not yet known, and CARB did not conduct a berth-

by-berth impact analysis for the hundreds of berths in California because such an analysis would provide information that could be misleading, should a different berth-by-berth scenario come to fruition.[15] Rather, the Regulation EA examined broad categories of impacts, considering the information then available as to the potential effects of the full range of reasonably foreseeable actions, including various control technologies and other compliance responses anticipated to occur in response to the Proposed Regulation.

---

[15] As CARB explained in its responses to public comments, "[T]he results of the berth-by-berth analysis are not final as terminals and vessels may choose any method of emissions reductions that best fits their operations. . . . Each vessel category (container, cruise, reefer, ro-ro, tanker) requires a different type of berth to conduct their operations and each terminal will have different operational methods with different configurations depending on the vessels that call there and the geographical location of the terminal. For example, some terminals will have vessel size restrictions . . . that will determine which vessels can berth at their terminal, while others may be able to accept vessels of all sizes. This means that the emissions control technology needed to control at-berth emissions will vary from terminal to terminal, depending on the business needs of each terminal and shipping line. . . . Additionally, as part of the Innovative Concept Compliance Option . . . terminals and vessels may choose from a wide array of potential creative emission reductions options in the port or port community as long as they achieve equivalent or greater emissions that would be achieved by reducing emissions from vessels at berth. . . . Thus, without formal engineering evaluations provided by each regulated terminal, CARB staff has no way of knowing which compliance responses are reasonably foreseeable at each terminal."

47

CARB further noted that it would not be the lead agency for the individual projects undertaken to come into compliance with the Regulation. CARB explained that "changes to the terminal or port infrastructure may be required to obtain wetlands permitting, follow guidelines and receive approval of the U.S. Coast Guard, observe Health and Safety Assessments for work activities, and at each port, Air District, city or coastal permitting may apply. . . . Infrastructure needs would be contingent upon a variety of factors that are not under the control or authority of CARB and not within its purview." Thus, if a project "would have environmental effects that are not examined within this [Regulation] EA, the public agency with authority over the later activity may be required to conduct additional environmental review as required by CEQA or other applicable law."

CARB thus envisioned a likely third step of environmental review by the proper agencies at the site-specific level for projects at the various ports and terminals affected by the Regulation. The Regulation EA stated "[s]pecific actions undertaken to implement the Proposed Regulation would undergo project-level environmental review and compliance processes as required at the time they are proposed."

4. *The Regulation EA adequately analyzed and addressed environmental impacts, safety hazards, and mitigation*

Under Public Resources Code section 21159, the Regulation EA was required to address the reasonably foreseeable methods of compliance with the Regulation, including an analysis of the reasonably foreseeable environmental impacts of those methods, as well as the reasonably foreseeable feasible mitigation

48

measures and alternative means of compliance with the Regulation. (Pub. Resources Code, § 21159, subd. (a)(1)-(3); see Guidelines, § 15187.) WSPA contends that while CARB identified certain "impacts regarding hazards and hazardous materials" associated with the Regulation's methods of compliance as "significant and unavoidable," the Regulation EA failed to "disclose the *extent* of those impacts or undertake any analysis" and instead "improperly deferred necessary 'safety studies' and failed to consider or adopt mitigation." WSPA has not demonstrated the Regulation EA was inadequate.

"An adequate description of adverse environmental effects is necessary to inform the critical discussion of mitigation measures and project alternatives." (*Sierra Club*, *supra*, 6 Cal.5th at p. 514; accord, *People ex rel. Bonta v. County of Lake* (2024) 105 Cal.App.5th 1222, 1234.) The " 'designation of a particular adverse environmental effect as "significant" ' " does not excuse " 'the failure to reasonably describe the nature and magnitude of the adverse effect.' " (*Sierra Club*, at p. 514.) However, an " ' " 'exhaustive analysis' " ' " or "technical perfection" is not required; rather, we examine the agency's review for " ' "adequacy, completeness, and a good-faith effort at full disclosure." ' " (*Id.* at p. 515; see Guidelines, § 15151.) Moreover, an environmental analysis must " 'evaluate a particular environmental impact only to the extent it is "reasonably feasible" to do so.' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 512.) " '[W]hen a proposed act . . . is reasonably foreseeable in general terms, the [EA] must include a general discussion of the act and its possible environmental effects, but need not include a detailed analysis of specific acts that cannot reasonably

be foreseen at the time the [EA] is prepared.' " (*Ebbets Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 954, first brackets in original; see *id.* at p. 955 [" '[A] detailed environmental analysis of every precise use that may conceivably occur is not necessary at this stage.' "].)

We independently review "whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact." (*Sierra Club, supra,* 6 Cal.5th at pp. 514, 516; accord, *People ex rel. Bonta v. County of Lake, supra,* 105 Cal.App.5th at p. 1230; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 505.) However, the correctness of CARB's factual findings regarding the likelihood of a future action is a predominantly factual matter that we review only for substantial evidence. (See *Ebbets Pass Forest Watch v. California Dept. of Forestry & Fire Protection, supra,* 43 Cal.4th at p. 954.)

Contrary to WSPA's contention, the Regulation EA contained an adequate program-level discussion of the magnitude of the potential safety hazards expected to result from efforts to comply with the Regulation, and the reasonably foreseeable mitigation measures. As discussed, the Regulation EA aimed to provide a general discussion of the potential environmental impacts of reasonably foreseeable compliance methods, as well as "broad policy alternatives and program wide mitigation measures," given that CARB did not know which methods of compliance with the Regulation the various regulated entities would choose to implement.

Subsumed within its lengthy analysis of various categories of potentially significant environmental impacts, the Regulation EA provided a 12-page analysis on potential impacts from

50

"hazards and hazardous materials." The EA addressed both the potentially significant short-term construction-related impacts as well as the long-term operational-related impacts of land-based compliance activities,[16] including from the transportation and use of hazardous materials, spill-related hazards, and risks of explosions.

WSPA particularly takes issue with the adequacy of the Regulation EA's discussion relating to "the probability, frequency, magnitude or severity" of the risk of explosions, but the Regulation EA emphasized that "the transport of oil involves acutely hazardous materials," and that explosions could occur during tankers' transport of hazardous materials, affecting terminal equipment or vessels at berth. The EA further addressed the risk that explosions can occur if proper precautions are not taken, such as when a vessel has a malfunctioning boiler or oxygen levels become too high during off-loading. The EA explained that these risks can be mitigated through the use of inert gas systems, which are pumped into cargo tanks to reduce oxygen levels and the associated flammability risks.

Because the Regulation EA was subject to streamlined procedures as a regulation setting statewide emissions standards, no "project-level analysis" was required before CARB's adoption of the Regulation. (Pub. Resources Code, § 21159, subd. (d); Guidelines, § 15187, subd. (e).) Rather, the program-level Regulation EA complied with CEQA's requirements by generally analyzing the environmental impacts to the extent they were reasonably foreseeable. (Pub. Resources, § 21159, subd. (a);

_____

[16] The Regulation EA concluded that both the short-term and long-term impacts to *vessels* would be "less than significant," a determination that WSPA does not challenge.

Guidelines, §§ 15168, 15187, subd. (c).)[17]  As CARB explained, possible compliance options for any given berth were uncertain and varied—from barge-based control technology, to land-side control technology, to Innovative Concepts—and the infrastructure needs were contingent on a variety of factors not under CARB's control.  As such, the Regulation EA's more general level of detail was appropriate.  (See *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 105 [rejecting an argument more specific detail was required on the duration of construction noise when it was not feasible at the time of EIR's preparation].)

In discussing the impacts and possible mitigation measures for hazards, the Regulation EA referenced the tiered approach that CARB had taken.  The EA explained that "[t]he authority to determine project-level impacts and require project-level mitigation lies with land use and/or permitting agencies for individual projects, and the programmatic level of analysis associated with this [Regulation] EA does not attempt to address project-specific details of mitigation."  As an example, the

---

[17]    For example, the Guidelines provide that "[a]n EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy."  (Guidelines, § 15146, subd. (a).)  On the other hand, "[a]n EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow."  (*Id.*, subd. (b).)

Regulation EA stated that "[a]s part of *individual project-specific* efforts to comply with the Proposed Regulation, it is anticipated that safety studies need to be performed for tanker terminals prior to implementation of specific compliance responses to ensure all safety considerations are met, given that the tanker vessels may carry flammable or explosive cargos."

WSPA asserts CARB was responsible for conducting such safety studies before approving the Regulation, and that its failure to do so was an abdication of its responsibility under CEQA. However, an "agency is not required to conduct every recommended test or perform all requested research or analysis." (*Cleveland National Forest Foundation v. San Diego Assn. of Governments, supra,* 3 Cal.5th at p. 512; see Guidelines, § 15204.) Moreover, after flagging the foreseeable need for "project-specific" safety studies in the Regulation EA, CARB appropriately deferred further analysis to the site-specific project level.

In *Bay-Delta, supra,* 43 Cal.4th 1143, the Supreme Court upheld an agency's decision to defer an analysis of impacts to the project level. The petitioners had challenged the adequacy of an agency's EIR with respect to a program to restore a bay and delta ecosystem to protect endangered species, contending in part that the agency "did not identify with adequate specificity the potential sources of water required for the proposed projects or analyze in sufficient detail the environmental impacts of taking water from those specific sources." (*Id.* at p. 1152.) The Supreme Court, however, held "CEQA does not mandate that a first-tier program EIR identify with certainty particular sources of water for second-tier projects that will be further analyzed before implementation during later stages of the program. Rather, identification of specific sources is required only at the second-

tier stage when specific projects are considered. Similarly, at the first-tier program stage, the environmental effects of obtaining water from potential sources may be analyzed in general terms, without the level of detail appropriate for second-tier, site-specific review." (*Id.* at p. 1169.)

Numerous other decisions likewise sanction an agency's deferment of a detailed analysis of impacts and mitigation measures to the project level, when the absence of project-specific details precludes such analysis at the program-level stage. (See *Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 792 [agency may defer analysis of impacts where the details of mitigation would be reviewed by the agencies responsible for the specific projects]; *Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 230 [a "program [EA] may appropriately defer discussion of site specific impacts and mitigation measures to a later project [EA] where such ' "impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases" ' "]; *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 346 ["[p]ostponing analysis" of the impacts of installing aerial viaducts at particular sites was "appropriate under tiering" from a more general EIR]; *San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1128 [where there were 15 options for implementing a new water quality control plan that dischargers could choose from, the "CEQA analysis cannot reasonably be performed until the . . . dischargers . . . choose the methods and infrastructure they will use . . . and apply for required permits to develop and operate management facilities"];

54

*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 375 [EIR properly deferred consideration of the environmental impacts of a project authorized under the general plan but not currently slated for development; "[c]onsidering the speculative nature of any secondary effects from an uncertain future facility, which will be subject to its own separate environmental review, . . . no further findings on environmental impacts or the rationale for such findings was reasonably required from the [EIR]"]; cf. *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 937-941 [city's EIR was inadequate where it entirely omitted discussion of foreseeable impacts to environmentally sensitive habitat areas and stated analysis would be deferred to later permitting phase of a development project].) We likewise conclude that the Regulation EA contained a reasonable level of detail with respect to the foreseeable impacts of the Regulation, and CARB appropriately deferred more specific analysis of the impacts and mitigation measures to later reviews of site-specific compliance methods.[18]

5. *CARB conducted a sufficient cumulative impacts analysis*

WSPA also argues that CARB "failed to conduct an adequate cumulative impacts analysis and adopt effective

---

[18] Although WSPA generally contends CARB provided inadequate responses to public comments raising the issue that CARB had failed to adequately analyze and mitigate safety hazards, WSPA fails to identify with any specificity the allegedly deficient responses. WSPA has thus forfeited the contention CARB's responses to the comments were deficient.

mitigation for marine environments." Under CEQA Guidelines, " '[c]umulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (*Id.*, subd. (b).) Generally, an agency must evaluate potentially significant impacts which may result from the combination of the proposed project with other projects "causing related impacts." (*Id.*, § 15130, subd. (a)(1); see *League to Save Lake Tahoe Mountain v. County of Placer* (2022) 75 Cal.App.5th 63, 147-150 (*Lake Tahoe*).)

We assume without deciding that CARB was required to include a full-blown cumulative impacts analysis in its Regulation EA. As discussed, as an environmental analysis performed in connection with CARB's adoption of a regulation setting air pollution standards, the Regulation EA was subject to special CEQA provisions for "expedited environmental review for environmentally mandated projects." (Pub. Resources Code, § 21159 et seq.) The provision setting forth the substantive requirements for the environmental analysis here, Public Resources Code section 21159, and the corresponding Guideline, section 15187, do not state that a cumulative impacts analysis is required, and no court has considered whether a cumulative impacts analysis is required as part of such an expedited review.

However, the Guidelines that set forth CARB's *general*

56

procedures for its preparation of environmental analyses provide that such analyses "shall contain . . . [a] discussion of cumulative and growth-inducing impacts." (Cal. Code Regs., tit. 17, § 60004.2, subd. (a)(4).) And, although CARB indicates the Guidelines do "not provide specific direction" for its cumulative impacts analysis, CARB does not contend it was exempt from the requirement to discuss cumulative impacts in the Regulation EA. Moreover, while certified programs like CARB are not technically subject to the Guidelines that establish the requirements for cumulative impacts analyses in EIRs, courts have generally held that significant cumulative impacts must nonetheless be considered "in the course of *any* environmental inquiry subject to CEQA's broad policy goals." (*Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 462; see *Pesticide Action Network North America v. Department of Pesticide Regulation*, *supra*, 16 Cal.App.5th at pp. 248-249.) Ultimately, because we conclude CARB conducted a sufficient cumulative impacts analysis, we have no cause to determine whether such an analysis was required under CEQA.

a. *Standards for Cumulative Impacts Analyses*

"[A]ssessment[s] of cumulative impacts are guided by standards of practicality and reasonableness; there is no one prescribed mode of analysis." (*East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1127; see Guidelines, § 15130, subd. (b).) The discussion of cumulative impacts must reflect the severity and likelihood of the impacts but need not provide as much detail as for impacts emanating from the particular project at issue. (Guidelines, § 15130, subd. (b); see *Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 51 [rejecting a challenge to a

cumulative impacts analysis for failing to address specific species and noting that CEQA does not demand an "exhaustive analysis of cumulative impacts"].)  " '[A] good faith and reasonable disclosure of such impacts is sufficient.' "  (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1403.)

The Guidelines provide that a cumulative impacts analysis should include one of two kinds of compilations of data: either (1) "[a] list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency"; or (2) "[a] summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect." (Guidelines, § 15130, subd. (b)(1); see Pub. Resources Code, § 21100, subd. (e) ["Previously approved land use documents, including, but not limited to, general plans, specific plans, and local coastal plans, may be used in cumulative impact analysis."].)

The Guidelines specify that "plans for the reduction of greenhouse gas emissions" are among the "previously approved land use documents" that may be relied on for a cumulative impacts analysis, and the Guidelines permit an agency to "incorporate by reference pursuant to the provisions for tiering and program EIRs" the pertinent discussion of cumulative impacts contained in a previously certified EIR.  (Guidelines, § 15130, subd. (d).)  Where the lead agency determines that the cumulative impacts of the proposed project have already been adequately addressed in a certified EIR for that plan, "[n]o further cumulative impacts analysis is required when a project is

consistent with a general, specific, master or comparable programmatic plan." (*Ibid*.) As pertinent here, a lead agency may consider cumulative impacts to have been "adequately addressed" if the agency determines the effects have "been examined at a sufficient level of detail in the prior environmental impact report to enable those effects to be mitigated or avoided by site specific revisions, the imposition of conditions, or by other means in connection with the approval of the later project." (*Id*., § 15152, subd. (f).)

> b. *CARB Properly Relied on a Summary of Projections from the SIP EA*

For its cumulative impacts analysis, CARB opted to use the "summary of projections" approach (Guidelines, § 15130, subd. (b)(1)(B)), incorporating the cumulative impacts analysis done for the SIP EA. (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 929-930 [instead of providing a list of projects, agency properly included a summary of projections of traffic conditions contained in an environmental document previously adopted by the county].) The SIP EA had "analyzed the collective impacts from a suite of proposed statewide air quality and greenhouse gas-reducing regulations." The Regulation EA then incorporated the analysis in the SIP EA by reference, and included a link to CARB's website where the SIP EA was posted. (See *id.* at p. 928, citing Guidelines, § 15130, subd. (b)(1)(B) [when agency relies on a summary of projections from an adopted statewide plan, the "document shall be referenced and made available to the public at a location specified by the lead agency"]; see also Guidelines, § 15152, subd. (f) [when agency relies on tiering to prior EIR, "the later EIRs . . . shall refer to the prior EIR and state where a copy of the prior EIR

may be examined"].)

WSPA takes issue with CARB's methodology of relying on the cumulative impacts analysis in the SIP EA. WSPA contends CARB ignored the list WSPA provided of 12 specific projects involving shoreline residential and industrial construction along California's coast that would be active during the time period in which Regulation compliance measures were likely to be implemented. WSPA contends "CARB should have considered these impacts in connection with the reasonably anticipated compliance methods at each port/terminal, including those requiring construction."

"We review an agency's methodology or criteria for assessing a cumulative impact for substantial evidence." (*Lake Tahoe*, *supra*, 75 Cal.App.5th at p. 150; accord, *Sierra Club*, *supra*, 6 Cal.5th at p. 514 ["a decision to use a particular methodology and reject another is amenable to substantial evidence review"]; *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 339 (*South of Market*).) Substantial evidence supported CARB's choice to rely on the summary of projections from the SIP EA.

The Regulation EA explained its methodology as follows: "The [SIP EA] provided a program-level review of significant adverse impacts associated with the reasonably foreseeable compliance responses that appeared most likely to occur because of implementing the recommended measures. The impact discussion includes, where relevant, construction-related effects, operational effects of new or modified facilities, and influences of the recommended actions on [greenhouse gases] and air pollutant emissions. The [SIP EA] considered cumulative impacts of a full range of reasonably foreseeable compliance responses to all the

60

recommendations, including the Proposed Regulation and considered the cumulative effect of other 'closely related' past, present, and future reasonably foreseeable activities undertaken to address air quality at the State level, as well [as] other activities with 'related impacts' ( . . . Guidelines[, §§] 15355[, subd.] (b); 15130[, subd.] (a)(1)).  CARB has determined that the cumulative effects of the Proposed Regulation have been examined at a sufficient level of detail in the State SIP Strategy.  Therefore, CARB has determined that for a cumulative analysis of the Proposed Regulation, it is appropriate to rely on the cumulative analysis contained in the [SIP EA].  The analysis of the [SIP EA] is hereby incorporated by reference."

The Regulation EA then summarized relevant portions of the SIP EA's discussion of cumulative impacts.  Like the SIP EA, the Regulation EA concluded that certain source categories, such as aesthetics, agriculture, forest resources, biological resources, cultural resources, geology and soils, hazards, water quality, mineral resources, noise, transportation and traffic, and the utilities and service system, could be cumulatively impacted by the Regulation.

As CARB explained in its responses to public comments, CARB determined that relying on the SIP EA's broader assessment of cumulative impacts from "many similar emissions reduction measures across the state" was "the most accurate way to consider impacts from an emissions-reduction measure," as opposed to examining the impacts from specific industrial projects.  It further determined that the cumulative impacts had been examined at a sufficient level of detail in the SIP EA, such that it could rely on the SIP EA's analysis and not further address cumulative impacts.  (See Guidelines, §§ 15130, subd. (d),

15152, subd. (f).)

Examining the SIP EA and the Regulation EA, it is apparent that their projections of cumulative impacts are based on CARB's comprehensive reviews of numerous statewide projects and the analyses conducted for each of those projects to determine their cumulative environmental impacts from construction, operational effects of new or modified facilities, and effects on emissions. CARB determined this measure of the cumulative impacts was more accurate than examining impacts from specific industrial projects along the coast, as WSPA suggested. It is not our prerogative to substitute our judgment for CARB's and to require it to use a "list of projects" approach rather than the summary of projections approach, when the Guidelines specifically condone both approaches and CARB's decision making was not arbitrary. Substantial evidence supports CARB's reliance on the summary of projections methodology. (See *South of Market*, *supra*, 33 Cal.App.5th at p. 337.)

WSPA also asserts in a conclusory manner that the SIP EA relied on data that was then 10 years old and thus outdated. While an agency may not rely on a summary of projections if it is "outdated or inaccurate" (*Lake Tahoe*, *supra*, 75 Cal.App.5th at p. 149), WSPA has not shown that CARB's analysis was either. WSPA points to no evidence in the record to suggest a change in circumstances that would undermine the reasonableness of CARB's reliance on the SIP EA, in accordance with Guidelines section 15130, subdivision (b)(1)(B). (See *South of Market*, *supra*, 33 Cal.App.5th at pp. 336-337, 328, 341 [2015 agency decision relying on 2012 project list was not problematic because "plaintiffs point to no evidence . . . render[ing] the project list

62

defective or misleading;" the determination of the appropriate study area "was not ' " 'arbitrary,' " ' nor was it ' "so narrowly defined that it necessarily eliminates a portion of the affected environmental setting" ' "]; see also Pub. Resources Code, § 21157.6, subds. (a)-(b) [a subsequent project-level report may rely on a master EIR that was certified within prior five years, or longer in the absence of substantial changes or new information].)  WSPA has not demonstrated that the data underlying the cumulative impacts analysis was outdated.

c.      *The Regulation EA, Which Incorporated the SIP EA by Reference, Contained a Sufficient Program-Level Discussion of Cumulative Impacts*

WSPA further asserts the cumulative impacts analysis that the Regulation EA borrowed from the SIP EA was incomplete and imprecise when it came to the effects of the Regulation. Because the SIP EA was meant to address statewide impacts from various emissions reduction measures, WSPA asserts that it contained an inadequate analysis of the cumulative impacts specifically in the coastal and marine environments around the ports and terminals that would be implementing compliance measures for the Regulation.  We are not persuaded.

The Regulation EA's cumulative impacts analysis incorporated by reference not only the SIP EA's specific section discussing "cumulative and growth-inducing impacts" (SIP EA, at pp. 101-121), but also the SIP EA's lengthy discussions of the possible impacts on numerous categories of resources.  (*Id.* at pp. 47-97.)  This is because the SIP EA indicated that "[a]s a result of the statewide context of the environmental analysis, the impact conclusions and mitigation measures in the resource-

63

oriented sections [at pages 47-97] are cumulative by nature, because they describe the potential impacts associated collectively with the full range of reasonably foreseeable compliance responses." (*Id*. at p. 102.) Our review of those lengthy sections of the SIP EA reveals a robust discussion, at the program level, of potential cumulative impacts on a number of categories of resources.

Because WSPA takes particular issue with the sufficiency of the analysis of cumulative impacts on marine biological resources, we recite in some detail the SIP EA's relevant analysis as to that category of resources. The SIP EA described cumulative impacts from increased infrastructure and manufacturing needs; increased mining and exports; and increased cultivation, production, collection, distribution, and shipments of low-emission fuels and feedstocks. (SIP EA, at p. 57.) Any construction undertaken for these activities "could require disturbance of undeveloped areas, such as clearing of vegetation, earth movement and grading, trenching for utility lines, erection of new buildings and infrastructure, and paving of parking lots, delivery areas, and roadways. [¶] The biological resources that could be affected by the construction of new manufacturing plants, biofuel facilities, or near-zero and zero-emission-related infrastructure would depend on the specific location of any necessary construction and its environmental setting, which is anticipated to mostly occur within existing disturbed commercial and industrial areas." (*Id*., at p. 58.)

The SIP EA specifically listed potential impacts from these activities to existing habitats, "including removal, degradation, and fragmentation of riparian systems, wetlands, or other sensitive natural wildlife habitat and plant communities;

64

interference with wildlife movement or wildlife nursery sites; loss of special-status species; and/or conflicts with the provisions of adopted habitat conservation plans, natural community conservation plans, or other conservation plans or policies to protect natural resources."  (SIP EA, at pp. 58, 61.)

With respect to the possible mitigation of such impacts to these biological resources, the SIP EA stated that CARB "does not have the authority to require implementation of mitigation related to new or modified facilities that would be approved by local jurisdictions.  The ability to require such measures is under the purview of jurisdictions with local or State land use approval and/or permitting authority. . . .  Project-specific impacts and mitigation would be identified during the environmental review by agencies with project-approval authority."  (SIP EA, at p. 58.) The SIP EA nevertheless listed a number of "practices that are routinely required to avoid and/or minimize impacts to biological resources," including retaining a qualified biologist to prepare a wetland survey of onsite resources before ground disturbance or construction, to be used to establish setbacks and prohibit disturbances of wetlands and other habitats; prohibiting construction activities or establishing protective buffers in the vicinity of raptor nests during nesting season; preparing site design and development plans that avoid or minimize disturbance of habitat and wildlife resources; and preparing spill prevention and emergency response plans.  (*Id*. at pp. 59-60.)

The SIP EA concluded that "[b]ecause the authority to determine project-level impacts and require project-level mitigation lies with land use and/or permitting agencies for individual projects, and the programmatic level of analysis associated with this [SIP] EA does not attempt to address project-

specific details of mitigation, there is inherent uncertainty in the degree of mitigation that may ultimately be implemented to reduce potentially significant impacts. [¶] Consequently, while impacts could be reduced to a less-than-significant level by land use and/or permitting agency conditions of approval, this [SIP] EA takes the conservative approach in its post-mitigation significance conclusion and discloses, for CEQA compliance purposes, that short-term construction-related impacts to biological resources . . . would be potentially significant and unavoidable." (SIP EA, at p. 60.) The SIP EA made the same conclusion with respect to the long-term operational impacts on biological resources. (*Id*. at pp. 61-62.) The Regulation EA summarizes this analysis from the SIP EA.

WSPA asserts that CARB's discussion of cumulative impacts on biological resources was cursory and disregards the numerous sensitive species and marine environments found in the coastal setting. However, the SIP EA's general discussion of the cumulative impacts on biological resources encompassed, in a broad sense, the potential impacts on such marine environments and species, as well as possible mitigation measures. The analysis was sufficient.

First, generally speaking, discussions of cumulative impacts "need not provide as great detail as is provided for the effects attributable to the project alone." (Guidelines, § 15130, subd. (b).) Moreover, the Regulation EA was an environmental analysis prepared in connection with the adoption of an emissions standard to combat air pollution. For this specific category of environmental projects qualifying for expedited review, the legislature specifically determined no "project-level analysis" was required. (Pub. Resources Code, § 21159, subd. (d);

66

see Guidelines, § 15187, subd. (e).)  CARB thus had no obligation to break down the possible cumulative impacts associated with specific measures to be implemented at each particular port or terminal or to discuss the particular possible impacts to individual habitats or species found at each site.  CARB had leeway to broadly describe foreseeable cumulative impacts as a result of implementation of anti-pollution measures including the Regulation.

Furthermore, it was not yet known which compliance methods would be implemented at each of the various ports and terminals, and CARB explained in the Regulation EA that any changes to individual ports and terminals would likely require site-specific permitting and compliance with standards from independent regulatory entities.  Infrastructure modifications to ports and terminals would also require wetlands permitting, approval from the U.S. Coast Guard, and permitting from local air district, city, or coastal entities.  CARB stated that "[i]n most cases, individual CEQA evaluations would be completed for each project."  Given the uncertainties about the compliance methods that would be adopted and the likelihood of site-specific reviews by other agencies, it was appropriate for CARB to defer a more detailed consideration of the cumulative impacts to those later project-level reviews.

*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833 is on point.  In that case, the court held that the university board that used a tiering process for approval of a large-scale expansion of the university properly deferred analysis of site-specific cumulative impacts on traffic. (*Id.* at p. 850.)  The court held that "[s]ite-specific impacts to the smaller residential streets in the neighborhood and related

67

mitigation measures . . . were properly deferred until the project is planned and a project EIR is prepared.  Although locating housing at this site may cause impacts to the neighborhood, there are many variables to be considered in connection with such a project, such as the location of entrances and placement of parking spaces, that will affect where in the surrounding neighborhood the impacts will be most felt and the measures that can mitigate those impacts.  These specifics cannot meaningfully be evaluated at this point.  There is no suggestion that deferring consideration of site specific impacts will disguise cumulative impacts or preclude proper consideration of mitigation measures if and when construction of such housing is proposed."  (*Ibid.*; see also *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 503 [" ' " '[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' " ' "]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 398 [general discussion of future activity and cumulative impacts sufficient when future uses are speculative because "[w]e do not require prophecy"]; *Planning and Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 756 ["Whether a [particular project] will occur in the future is speculative as to both its timing and scope, and lead agencies are not required to speculate regarding potential impacts"]; *Alliance of Small Emitters / Metals Industry v. South Coast Air Quality Management Dist.* (1997) 60 Cal.App.4th 55, 67 [agency was not required to undertake an analysis of possible future environmental effects of a new air pollution control regime featuring emissions cap and trade

program, when pollution control technology did not yet exist]; *Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 631 [city did not fail to adequately examine cumulative impacts where the project at issue was "at a stage where development is conceptual," the "[c]ity's approval of [the] project specified that traffic issues would undergo further environmental review," and "cumulative impacts existing at subsequent stages of development of each project will be addressed and will be actual rather than conceptual"]; *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 681 ["It would be unreasonable to expect this EIR to produce detailed information about the environmental impacts of a future regional facility whose scope is uncertain and which will in any case be subject to its own environmental review."].)

In sum, it was appropriate for CARB to include a general level of analysis of cumulative impacts in the Regulation EA, and to defer more specific discussion of cumulative impacts to site-specific environmental documents. CARB provided a " 'good faith and reasonable disclosure' " of foreseeable cumulative impacts at a program-wide level. (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1403; see Guidelines, § 15151.) No more was required.

>        d.       *CARB's Cumulative Impacts Analysis Was Not Deficient for Failing To Address the Effect of the Regulation's Accelerated Timelines*

WSPA contends CARB failed to analyze and disclose whether its acceleration of the timelines for the emissions standards for tankers would cause more severe cumulative impacts. It is apparent, however, that CARB examined the issue and determined "these modifications would not result in any new

reasonably foreseeable significant environmental impacts or substantially increase the severity of an identified environmental impact." Specifically, CARB determined "[a]ccelerating implementation dates for . . . tanker vessels would not change the nature or extent of physical changes to the environment; it would simply result in them occurring one or two years sooner." In responding to public comments on this point, CARB explained that even if the accelerated timelines caused accelerated construction in coastal marine environments, the overall impacts would remain the same, and "the impact discussion in the EA does not hinge on the timeline" or "whether activities overlap."

CARB subsequently stated that the accelerated timeline did not "have a large potential to cause cumulative impacts from other marine-related construction associated with this [R]egulation, as no other compliance dates for ocean-going vessels or their related terminals are scheduled to go into effect during the new implementation years," and "most ro-ro terminals are expected to utilize barge-based capture and control systems versus a land-based control system that would require construction of shore-side infrastructure."

WSPA speculates, without any supporting evidence, that the accelerated timeline could have added to the cumulative impacts on the marine environment, and contends CARB failed to support its determination to the contrary with substantial evidence and reasoned analysis. WSPA's arguments are off the mark. It is WSPA's burden to show why CARB's assessment of the impacts of the accelerated deadline was faulty or lacking, and it has not done so. (See *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 632 [appellant's challenge to EIR for insufficient evidence must

"show why it is lacking," and "[f]ailure to do so is fatal"].)

## DISPOSITION

The judgment is affirmed. CARB is entitled to recover its costs on appeal.

STONE, J.

We concur:

MARTINEZ, P. J.

SEGAL, J.